Foran, J.
It will not be necessary to make any extended statement as to the issues involved in this ease. It is sufficient to say that the plaintiff,.the Guardian Savings & Trust Company, the intervening petitioner, Amelia B. Baxter, and the defendant, William Bryar, are the owners of sub-lots in the Euclid Heights allotment, the Guardian Savings & Trust Company being the owner of sub-lots 694 and 695; the intervening petitioner is the owner of sub-lots 664, 697 and 698, and the defendant Bryar is the owner and is'in possession of sub-lot 699. It will therefore be seen that all of these lots are practically contiguous, some of *418 them being on Lancashire road and some on Hampshire road. The Euclid Heights allotment as originally planned and laid out Something over twenty years ago provided for a general plan of restrictions; and while perhaps the deeds in themselves to the various lots sold did not contain covenants that all sales of lots in this allotment should be made subject to like restrictions, as was done in the case of Wallace et al v. The Clifton Land Company, 92 O. S., 349, nor can it be said that each purchaser agreed and covenanted, as well for the use of every other person who might become the owner of a lot in this allotment as for the use of his grantor, that he would observe the restrictions, as was done in McGuire v. Caskey, 62 O. S., 419, yet all the lots were sold, so far as they were sold, in pursuance of a general plan or scheme for the improvement of the property and a consequent benefit to all purchasers. What is meant is, that while the deeds did not have inserted in each of them in express words the scope and purpose of this general plan, so as to bind each separate purchaser and his assigns, yet the plats and the allotment and the maps and the advertisements were of such a character that all purchasers understood that the lots were sold subject to certain restrictions for the benefit of all lot purchasers and according to a general scheme or plan for the improvement of the property and the resulting benefits of such improvement to all owners of property in this allotment as a residential district. The promoters of the Euclid Heights allotment had visions which might have been realized had there been sufficient capital to carry through the scheme of allotment as originally planned; but that such capital was lacking is made evident by the subsequent events. The tract of land was a large tract, containing several thousand lots, and to raise money for the purchase of land, as well as to improve it according to the general plan, a blanket mortgage was placed upon the whole tract, this mortgage being to secure payment of bonds issued thereunder. The mortgagee and the bondholders were not, of course, bound by the restrictions, and might sell the property, in case default was made in payments, free and clear of such restrictions. It was provided, of course, that as each lot was sold *419 and paid for, the lot so sold was to be released from the operation of the mortgage. The allotment company becoming bankrupt, foreclosure proceedings were instituted and a decree of foreclosure obtained in common pleas court of this county. Every person to whom a lot had been sold was made a party defendant in the foreclosure proceeding, and the decree, to a certain extent, may be said to be a consent decree. The mortgagee and the bondholders discovered, of course, that they could not realize the amount of the indebtedness due to them, or the face of the mortgage, if the lots were to be sold subject to the original restrictions. In some instances the restrictions ran to August 31, 1953; in other instances the restrictions expired on November 23, 1916, and in some instances the restrictions expired November, 1917. Sufficient to say that the dates of the expiration of the restrictions varied in several portions of the allotment. The land was allotted in 1894. In the decree it was sought by the mortgagee or the bondholders and by the persons to whom lots had been sold, and which lots had been released from the operation of the mortgage, to make all the restrictions expire on January 1, 1934, and also to protect, as far as possible, the bona fide purchasers of lots sold by the Euclid Heights Realty Company; hence some of these lots were sold under the decree subject to restrictions which prohibited the use of liquor only upon the premises; others of the lots were sold with restrictions limiting the use of the land to residence purposes only; .and again, others of the lots were sold limiting the use of the lots or land “for private residence purposes only.” The defendant’s lots contained this latter restriction, the restrictions being as follows:
1. Until January 1, 1931, said premises shall not be used for apartment or boarding house purposes, but shall be used for private residence purposes only, including necessary outbuilding, garages and barns.
2. During said period only one dwelling-house or residence shall occupy said premises.
3. During said period no dwelling-house or residence shall be erected or moved upon said premises, or any part thereof, which shall be of less value than $6,000.
*420 These restrictions are,contained in the deeds of the lots owned by the plaintiff, the intervening petitioner and the defendant.
The defendant proposes and claims the right to erect upon one of his lots, or upon premises owned by him, a double-family house, one located above the other. Except in this respect, the proposed dwelling conforms strictly to the restrictions. There are no dwellings upon the lots owned by the plaintiff, the Guardian Savings & Trust Company. Upon the lot owned by the intervening petitioner, Amelia B. Baxter, there is a dwelling-house erected about twenty years ago and costing at that time tabout $20,000. On lot 667 there is another dwelling erected perhaps some time later. Between the lot of the intervening petitioner and this latter dwelling there are two lots, and practically east of lot 667 there are three lots, which contain the restrictions already described. Lots 662 and 663, east of the Baxter residence, or the residence of the intervening petitioner, are also similarly restricted. Nine lots north of these two dwellings are also similarly restricted. It is one of these lots owned by the defendant upon which the proposed double house is sought to be erected. The defendant’s lot and the other ninq lots similarly restricted are located on Hampshire road. The lot of the intervening petitioner, Amelia B. Baxter, and the( lot upon which a dwelling-house is already erected east of her, face on Lancashire road.
The answer of the defendant, in his second defense, avers that all the lots on Hampshire road, except eight thereof, have erected thereon apartment houses, two-family houses and double houses; and that the lots not so built upon can not be sold oi disposed of for any other purpose except buildings of the same character, that is, for apartment houses,_ two-family houses or double houses; and that if the restrictions are so enforced as to prevent the erection of dwelling-houses or houses of this character, these lots are no longer beneficial or advantageous, and the defendant says that the restrictions should not be held to forbid the character or kind of dwelling he proposes to erect, for the reason that the character of the neighborhood has so changed that it would be inequitable to enforce these restrictions *421 as the plaintiff and intervening petitioner claim they should be enforced.
It was. also claimed in argument that the defendant had no notice of any general plan or scheme of improvement in this allotment which was intended to enhance the value of the property by general compliance with the restriction by all lot owners, and therefore the restrictions can not be enforced as against him by an adjacent or adjoining lot owner or any lot owner, and in no event could be enforced except by the original grantor.
It was held in Schubert v. Eastman Realty Company, 1 O. C.C(N.S.), 585, that when the owner of land subdivides and sells it to lot purchasers with restrictions in the deeds as to the purpose for and manner in which the land may be used, one lot purchaser can not enforce such restrictions against another lot purchaser unless the restrictions are uniform for all the lots similarly situated and part of a general scheme for the improvement of the whole tract. This is undoubtedly good law.
In a recent case, Kiley v. Hall, not cited by counsel, decided by the Supreme Court May 15, 1917, and which may be found in 96 Ohio State, —, it was held in the syllabus:
“1. The purchaser of a lot in an allotment whose deed contains restrictions as to the use of the lot, is not chargeable from that fact alone with notice that like restrictions are contained in the deeds of the other purchasers of lots in the allotment.
“2. A lot owner can not maintain an action to enforce by injunction the observance of restrictions contained in the 'deed of another lot owner where it does not appear that the latter purchased his lot with notice of a general plan for the improvement of the lots of the allotment in accordance with the restrictions contained in his deed, or with notice that such restrictions were inserted in his deed for the benefit of the owners of the other lots of the allotment.”
This is the very latest utterance of our Supreme Court upon this subject.
It is not denied and must be admitted that in the original allotment of the Euclid Heights Realty Company there was a *422 general plan and scheme of improvement of the property and its subsequent benefit to all lot owners, and this general scheme or plan was of such character as would enable one lot owner to enforce by injunction against any other lot owner the restrictive covenants written into each deed in pursuance of this general plan. The defendant purchased 'his lot at a judicial sale where the lots were auctioned off by the sheriff and sold to the highest bidder in pursuance of the decree and advertisement. The defendant received a sheriff’s deed, and it has been universally held that the effect of a deed made by a sheriff or other proper officer to a purchaser of land at an execution sale, is to vest in the purchaser as good and as perfect a title or estate in the premises sold as was vested in the defendant at or about the time the land became liable to the satisfaction of the judgment. This doctrine is so well established that citation of authorities is unnecessary.
In Stiles v. Murphy, 4 0., 97, it was held that—
“The deed of conveyance (from the sheriff) shall be as good and sufficient as the debtor could have made at any time after the said land became liable to the said judgment.”
And in Sternberger v. Baglcmd, 57 O. S., 148, it was held that— •
“The deed of a sheriff conveyed a title as good and complete as a judgment debtor can convey.”
•Or, in other words, the sheriff, acting under a decree of court, gives to the purchaser the same title that the judgment debtor could have given, and no greater title. The judgment debtor against whom the decree ran and operated was the Euclid Heights Realty Company, and it must be held that the deed from the sheriff to a defendant in this ease has practically the same effect as a deed made to him by the Euclid Heights Realty Company ; and, therefore, under the law, any lot owner has a right, under the circumstances, to enforce by injunction the restrictive covenants contained in the deeds. It will not avail the defend *423 ant to say that he did not have such notice as the Supreme Court says is necessary in the case of Kiley v. Hall, supra, and for the reason that it has become a doctrine of stare decisis in Ohio that the rule of caveat emptor is applicable in all its force to purchasers at judicial sale. Pittsburg Ore Co. v. Linde, 55 O. S., 23; Arnold v. Donaldson, 46 O. S., 73. This doctrine may be said to be elementary.
Under the doctrine of caveat emptor, the defendant was bound to examine and judge for himself as to the title of the land he purchased from the sheriff, unless he was dissuaded from so doing by representations of some kind; and in the absence of fraud or an express warranty, the defendant has no relief against a defect in the title or any restrictions appertaining to these lots, nor has he any relief for any unsuitableness of the land for any particular purpose, and which an examination, which he was free to make, would have revealed. If he had examined the decree or made such an examination as he was bound to make, he would have known and discovered that the lot he was purchasing owed a servitude to every other lot in this allotment, and this servitude is in the nature of an easement, or what might be termed a negative easement, the exercise of which by the other lot owners might be injurious to him, as, under the circumstances, they have a right to forbid the building of a double house, which he is now proposing to construct and erect.
It was held in the case of Vattier v. Little, 6 O., 483, that ‘‘The sale by sheriff excludes all warranty. The purchaser takes all risks. He buys on his own knowledge and judgment. If this was not the law, an execution, which is the end of the law, would only be the commencement of a new controversy.”
In the case of Ellenberger v. Sheppard, decided June 5th, 1916, by the Cuyahoga County Court of Appeals, and which involved a question of restrictions precisely similar to this in the case at bar — one of the Euclid Heights Realty Company lots — it was held that:
“A general plan for uniform restrictions was adopted by all the several lot owners, and became incorporated as a part of *424 the decree in foreclosure proceedings, by which plaintiff availed himself of the right to bring this action.”
With this the court of appeals said it was not much concerned, “inasmuch as we think the decree bound each lot owner who consented to its terms, and thereby became operative in behalf of the plaintiff, and thereby gave him capacity to bring this suit.”
In this case it was held that the word “private,” as used in the deeds to defendant, the plaintiff .and the intervening petitioner, meant that only a single residence could be erected upon any of these lots; and this is undoubtedly the doctrine of Hunt v. Held, 90 O. S., where the court, in the opinion at page 283, says:
“If it had been intended that the building was to be for the use of one family only, words indicating such an intention would have been used, .as is frequently done, such as ‘a single residence,’ 'a private residence,’ and ‘a single dwelling-house.’ ”
The same doctrine is held in Arnoff v. Williamson, 94 O. S., 145, where the court say, in referring to the case of Hunt v. Held, 90 O. S., supra, at page 151:
“We took the position there that the word residence was used in contradistinction to business, and it was held that such a provision did not prevent the erection of a double or two-family residence on the premises.”
And then the court, on page 152, approves and readopts the ' language used in Hunt v. Held, already quoted.
There can be no doubt, we think, as to the correctness of this holding. The language of the restrictions is that “Said premises shall not be used for apartment or boarding-house purposes, but shall be used for private residence purposes only.” It will be here seen that apartments and boarding-houses are expressly excluded, and that the property was intended to be used for private residences only. Private really means personal or concerning an individual or peculiar to an individual; that is, it relates to the privacy of an individual. Under her deed the interven *425 ing petitioner, Amelia B. Baxter, had a private right of property, that is, a right in her individual or personal capacity, that is, a right purely personal to herself. She had a right of retirement or seclusion that would be invaded by a two-family residence or an apartment house on the adjacent or adjoining lot.
It is true that courts undoubtedly are inclined to hold that where there is any doubt as to the meaning, force and scope of restrictions, that doubt should be resolved in favor of the free use of the land. Restrictions of this character are perhaps in derogation of common law right, and are to be strictly construed; still we must not lose sight of the fact that acquired rights of individuals should not be freely disregarded. In this age of super-organized activity, in the mad rush for money, place and power, there ought to be some place for the man who believes that the thunderous rush and roar of commerce is not all of life, and that a man who rolls on golden wheels along the sordid road of existence, “an incarnation of fat dividends,” is rather to be pitied than envied. There are some men who still prefer to dream in quiet places and invite the genius of solitude rather than dwell in splendor amid the cacophonous tumult of industrialism and the nerve-racking atmosphere of eyelopean competition. When we find a man of this type who has purchased the right to immunity to live and enjoy life far from the maddening, roaring crowd and the smoke, dirt, ear-splitting noise and brawling saloon frequenters, we feel that he has some rights that should be protected. There are still some men left on the oasis of peace in the scorching desert of commercialism, whitened with the bleached bones of men prematurely dead from frazzled, deckle-edged nerves, who believe that apartment houses, terraces and flats are monstrosities productive of more social and other evils than ever escaped from Pandora’s box; who have learned from experience that the closer we cling to the bosom of mother nature the happier we are, and that without happiness and the power to appreciate the joy of natural living life is a hideous nightmare. There are many men still living who believe that apartment houses and terraces are places of abomination where little children are execrated and forbidden and where *426 pedigreed poodle dogs are mothered and coddled. These men love the fields, the forests, the trees, and they like to live under the open sky where nature “holds communion with her visible forms.” These men believe that “silence is the element in which great things fashion themselves together,” and that “silence ¡and solitude heal the blows of sound.” And it is well for the community and for the nation at large that there are still living a good many persons who fondly cherish the dream, at home, that silence and solitude are the great educators that teach men how to live and how to die.
It is claimed by counsel for the defendant, whose argument was not only adroit but at times really persuasive, that there has been a change of conditions in this allotment which renders it inequitable to now enforce these restrictions. It was said in Burton v. Cooper, 8 N. P., 406, that—
“Where land is laid out for sale as building lots and put upon the market as subject to conditions or restrictions that are held out to purchasers as applying to the whole tract so as to create a general plan of subdivision, any person taking the land with either actual notice, as by covenants embodying the conditions or restrictions appearing in the chain of title of the lots, or constructive notice, as by the plan itself, will be bound by the conditions, and a court of equity will aid any purchaser in preventing any of the other purchasers or owners from defeating the plan.
' ‘ ‘ Such a plan is not abandoned until the parties have waived the rights accruing to them from the covenants or general plan, or until the plan is so far abandoned that the original purpose is defeated thereby.”
The testimony. clearly shows that there has been no such change of conditions since defendant purchased his lot as falls within the dictum just quoted. The decree fixed the status of all lot owners who had purchased prior to the decree or those who purchased under the decree, and the testimony does not show that there has been any abandonment or any waiver from the Euclid Pleights Realty Company or the purchasers under the judicial sale.
*427 In Evans v. Foss, 194 Mass., 513, it was held, in the last paragraph of the syllabus, that —
“If, since the restriction was imposed, there has been no material change in the conditions directly affecting the character and use of the property in question, a court, in a suit in equity, will enforce the restrictions.”
And the court further said that the mere fact, in the opinion of the judge that hears the ease, that the land may at some future time be wanted for business purposes furnishes no reason for refusing to enforce the restriction.
For the reasons indicated, the prayer of the petitioner and intervening petitioner will be granted, and the .defendant will be perpetually enjoined from erecting the character of house described in the plaintiff’s petition.